IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONNECT INFORMATION TECHNOLOGY | : | CIVIL ACTION |
| PROFESSIONALS, LLC, et al., | : | NO. 20-994 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MEDMATICA CONSULTING ASSOCIATES, | : | |
| | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          August 17, 2021

## I. INTRODUCTION

This is a breach of contract case. Plaintiffs Connect Information Technology Professionals, LLC ("Connect") and MKW & Associates, Inc. ("MKW") allege that Defendant MedMatica Consulting Associates ("MedMatica") breached their respective Subcontracting Services Agreements by failing to pay the agreed upon monthly sum. Plaintiffs seek damages for the amount they were not paid, plus interest.

MedMatica now moves for summary judgment. Since Plaintiffs have identified evidence which could enable a jury to find that there was a breach of contract, MedMatica's motion for summary judgment will be denied.

## II.   **BACKGROUND**[1]

The dispute between the parties arose out of Subcontractor Services Agreements ("SSAs") that Plaintiffs, Connect and MKW, entered into with MedMatica. MedMatica provides implementation and technology services to health organizations. Before contracting with Plaintiffs, MedMatica entered into an agreement with HealthTech Advisors ("HTA"), a healthcare advisory firm, "to provide a team of specialists for the implementation of the Epic (Electronic Health Records) suite of solution applications for . . . One Brooklyn Health System ('OBHS')." Def.'s Mot. Summ. J. 3, ECF No. 23-2.[2] MedMatica sought the services of Plaintiffs to satisfy their agreement with HTA.

### A. Connect's Relationship with **MedMatica**

On September 28, 2018, lead recruiter for MedMatica, Diana Goggin, emailed the principal and president of Connect, Yolanda Jones,for an interview with HTA for the OBHS project. In the email, Goggin referred to HTA as "our partnering firm that is

---

[1]   As required at the summary judgment stage, the Court views the facts "in the light most favorable to" the nonmoving party and draws "all reasonable inferences" in that party's favor. Young v. Martin, 801 F.3d 172, 174 n.2 (3d Cir. 2015) (citing Tri-M Grp., LLC v. Sharp, 638 F.3d 406, 415 (3d Cir. 2011)).

[2]   Plaintiffs dispute the admissibility of this fact on the basis of the Court's July 17, 2020, ruling which dismissed two counts of fraudulent inducement. Plaintiffs assert that neither party may "introduce[] any documents or testimony relating to its relationship with Health Tech Advisors that precedes the date Plaintiffs' Agreements were signed because Health Teach Advisors is not mentioned in Plaintiffs' Agreements." Pls.' Resp. Opp'n Def.'s Mot. Summ. J. 2-3, ECF No. 25. The Court need not address this argument because the Court provides this fact only for background purposes; it is not a fact which will alter the outcome of the Court's decision.

conducting interviews for One Brooklyn." Def.'s Mot. Summ. J. Ex. E, at 2, ECF No. 23-8. On October 22, 2018, Jones, on behalf of Connect, entered into an SSA with MedMatica.

On December 19, 2018, Director Beth Mansfield from MedMatica informed Jones that the project was put "on-hold" until "grant funding is received from NY State." Def.'s Mot. Summ. J. 8, ECF No. 23-3. The next day, Mansfield said, "[t]he delay to the project and termination of our services effective this Friday Dec[.] 21 was a surprise to us all." Def.'s Mot. Summ. J. 6. Mansfield also stated that MedMatica would pay out the days Jones worked in December, and that HTA was working on a deal "that will hopefully keep you engaged in 2019 until the funding comes through estimated to be about 75% of current effort." Def.'s Mot. Summ. J. 6.

On January 23, 2019, Managing Principal Jeffrey White from HTA emailed Jones and said, "the goal is to have the funding agreement complete and signed by the end of January. Once the agreement is signed, we should be able to get back to work on the Epic project very soon thereafter." Def.'s Mot. Summ. J. 8. On March 13, 2019, Mansfield emailed Jones to advise her that there were "voluntary" update calls that would be "a good idea to join, even though it is not billable." Def.'s Mot. Summ. J. 7. On August 29, 2019, Jones resigned from the project, which had not yet begun. In her email to Mansfield, Jones stated, "had

I have known that there was truly no funding or project for which I was contracted for I would have remained on the contract I was on or accepted other offers." Def.'s Mot. Summ. J. Ex. E, at 48.

Jones testified that she "did not provide any additional invoices" after December 2018, based on an assumption that she would be paid the monthly amount of $19,550 eventually. Jones Dep. 66:4-16, ECF No. 23-4. Jones testified that to her knowledge, there were funds available, and "[i]t was a matter of Eli [CIO of OBHS] letting the funds go." Jones Dep. 136:14-22.

**B. MKW's Relationship with MedMatica**

MKW's engagement with MedMatica began from a referral from Jones. On November 6, 2018, Goggin emailed Jones to inquire about referrals because MedMatica was "actively recruiting for additional [project managers]." Def.'s Mot. Summ. J. Ex. E, at 12. On April 26, 2019, Goggin emailed Woodley (owner of MKW) stating, "One Brooklyn is now in the process of restarting again." Def.'s Mot. Summ. J. Ex. F, at 3-4, ECF No. 23-9. On May 9, 2019, MKW entered into an SSA with MedMatica. Pls.' Resp. Opp'n Def's Mot. Summ. J. Ex. 2.

Woodley testified that when she entered into the contract with MedMatica she was not aware that the project was not ongoing, and that "[she] was actually told that [she] would start by June 1st." Woodley Dep. 25:21-22, ECF No. 24-1. Woodley

4

testified that it was "absolutely" her understanding that
MedMatica had an existing contract to perform the OBHS work when
she signed the contract. Woodley Dep. 26:3-7, ECF No. 25.
Woodley testified that she was told every couple of weeks that
the project would start soon, but it did not restart until
October 2019. At that time, MedMatica asked Woodley if she
wanted to start (rather than asking her to enter into a new
contract), but Woodley declined to begin work on the project
because she "didn't trust that if [she] started, it would go on.
[She] did not have faith in what they were representing."
Woodley Dep. 69:20-70:4.

### C. The Terms of the SSAs

The SSAs that Plaintiffs entered into with MedMatica
contain nearly identical terms. Both SSAs contain a provision in
paragraph five which states as follows:

> Neither MedMatica nor Consultant may terminate this
> SSA or any Addendum hereunder prior to the End Date;
> provided, however, that this Agreement will terminate
> immediately without any further liability of either
> party upon the occurrence of any of the following:
> Client Termination – Should client terminate its
> relationship with MedMatica at any time for any
> reason. . . . Other – By MedMatica or Consultant upon
> Twenty One (21) days advance written or verbal notice.

Pls.' Resp. Opp'n Def.'s Mot. Summ. J. Exs. 1-2.

Both SSAs also contained an Addendum in which MedMatica
agreed to pay the respective Plaintiffs a monthly fee ($19,550
for Jones on behalf of Connect, and $18,700 for Woodley on

behalf of MKW). The Addendum stated, "Payment will be rendered to Consultant on a bi-monthly basis each month at 1/2 the Monthly Amount found in Schedule A with receipt of the consultant's invoice by MedMatica." Pls.' Resp. Opp'n Def.'s Mot. Summ. J. Exs. 1-2.

On February 24, 2020, Plaintiffs filed suit against MedMatica, asserting claims for breach of contract and fraudulent inducement. On July 17, 2020, this Court granted MedMatica's motion to dismiss the claims for fraudulent inducement. On March 13, 2021, MedMatica moved for summary judgment on the remaining breach of contract claims. This motion is now before the Court.

## III. LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Physicians Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 618 (3d Cir. 2020) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A factual dispute is genuine if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at 248).

The Court views the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (citing Fed. R. Civ. P. 56(e)).

## IV.   DISCUSSION

Under Pennsylvania law, a claim for breach of contract requires proof of three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247, 1258 (Pa. 2016) (citing J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc., 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002)).

When interpreting a contract under Pennsylvania law, "courts first determine whether the contract is clear or

ambiguous." Apacheta Corp. v. Lincare, Inc., No. 16-2030, 2017 WL 5901085, at *3 (E.D. Pa. Nov. 30, 2017) (citing Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am., 693 F.3d 417, 426 (3d Cir. 2012)). "If the contract is clear, the court must apply its plain meaning." Id. (citing Pac. Emps. Ins. Co., 693 F.3d at 426). But, "if the contract is ambiguous, its meaning becomes a question of fact and may preclude summary judgment." Id. (citing Pac. Emps. Ins. Co., 693 F.3d at 426).

"A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." Id. (quoting Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986)). When evaluating whether a contract is ambiguous, the Court should analyze "the context in which the agreement arose." Id. (quoting Steuart v. McChesney, 444 A.2d 659, 662 (Pa. 1982)). The Court may "consider extrinsic evidence such as 'the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.'" Id. (quoting Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993)).

Here, it is clear that the parties entered into a contract. However, the record evidence indicates that the SSAs are ambiguous as to the meaning of both paragraph five and the payment provision in the Addendum.

### A. Paragraph Five of the SSAs

MedMatica argues that when the lack of state funding caused HTA to stop work on the OBHS Project, the SSAs with both Plaintiffs terminated immediately pursuant to paragraph five, which states as follows: "[T]his Agreement will terminate immediately . . . upon the occurrence of any of the following . . . Client [HTA][3] Termination - Should client terminate its relationship with MedMatica at any time for any reason. . . . Other – By MedMatica or Consultant upon Twenty One (21) days advance written or verbal notice."[4] Def.'s Mot. Summ. J. 16, ECF No. 23-3. Plaintiffs argue that the SSAs did not immediately terminate because MedMatica maintained a relationship with HTA

---

[3]     The parties dispute whether the "Client" referred to in the SSAs is HTA or OBHS. However, the Court need not decide one way or the other, because even assuming, as MedMatica argues, that HTA is the Client, MedMatica's arguments still fail for the reasons explained below.

[4]     MedMatica also makes two related arguments which are either frivolous or unpersuasive. First, it argues that the SSAs terminated immediately pursuant to the Cause provision of paragraph five ("Should Client [HTA] request that Consultant no longer provide Services to Client [HTA]"), but this argument is based on the premise that "Consultant" refers to MedMatica, which is clearly frivolous. The remainder of paragraph five, and even the remainder of the Cause provision ("or if MedMatica is dissatisfied with the Services provided by Consultant") makes explicitly clear that Plaintiffs, not MedMatica, are the "Consultant." Thus, the Court need not consider this argument.

Second, MedMatica argues that Plaintiffs' failure to submit invoices as required under the SSAs indicates that Plaintiffs understood their SSAs had been terminated. But even if the Court agreed that the phrase "payment will be rendered to Consultant . . . each month at 1/2 the Monthly Amount found in Schedule A with receipt of the consultant's invoice," Def.'s Mot. Summ. J. 17, ECF No. 23-3 (emphasis added), required Plaintiffs to submit invoices, Plaintiffs have plausibly explained that they did not submit invoices because they knew that funding was temporarily held up, but they expected to be paid once the funding was released. See, e.g., Jones Dep. 70:12-73:23, ECF No. 25. Thus, the failure to submit invoices does not definitively prove that Plaintiffs believed their SSAs were terminated.

even though New York State funding for the project was not yet received.

Plaintiffs have pointed to specific facts which demonstrate that the meaning of "terminate its relationship" is ambiguous and creates a genuine dispute of material fact for trial concerning whether MedMatica's relationship with HTA was actually terminated or ongoing.

First, Plaintiffs demonstrated that MedMatica engaged MKW after the alleged date of immediate termination. On December 19, 2018, MedMatica informed Jones that the OBHS Project was "on-hold" until state funding was received and that the "hold" was effective December 21, 2018. Def.'s Mot. Summ. J. 8. MedMatica argues that when the OBHS Project was suspended and Connect was notified, Connect's SSA terminated immediately pursuant to paragraph five of the SSA. However, MedMatica then entered into an SSA with MKW on May 9, 2019, when state funding was not guaranteed. Based on MedMatica's argument, MKW's SSA was invalid when the parties reached an agreement because New York State funding was not secured. MedMatica's engagement with MKW when state funding was not received indicates that MedMatica's relationship with HTA was not actually "terminated."

Second, Plaintiffs point to the fact that MedMatica continued to communicate with Connect regarding the Project for approximately eight months after the alleged termination of

Connect's SSA, indicating that the relationship between MedMatica and HTA was not actually "terminated." On December 20, 2018, Mansfield told Jones that "our services" terminated effective December 21, 2018. Def.'s Mot. Summ. J. Ex. E, at 15, ECF No. 23-8. "[O]ur services" indicates both MedMatica and Connect's services on the OBHS Project. However, MedMatica then continued to discuss the status of the Project with Connect over several months. These communications included "voluntary . . . update calls" which began in March 2019. Def.'s Mot. Summ. J. Ex. E, at 20.

For several months, MedMatica represented that the Project would start again soon and that Connect should stay updated on the Project. In June 2019, Mansfield told Jones and Woodley that "things appear to be on-track for a mi[d]-July start." Def.'s Mot. Summ. J. Ex. E, at 26. In July 2019, Mansfield told Jones that "the expected start date is August." Def.'s Mot. Summ. J. Ex. E, at 33. Thus, the record evidence demonstrates that MedMatica did not consider its relationship with HTA to be "terminated." Additionally, MedMatica never discussed with MKW or Connect the need to draft new SSAs, which would need to be executed if the SSAs had truly terminated when funding was not secured.

Third, Plaintiffs point to Bruce Generotti's (employee of MedMatica) deposition testimony. Generotti stated he drafted the

11

SSA for MKW "based on the fact that HTA work may start." Generotti Dep. 43:10-12, ECF No. 25. This fact indicates that MedMatica was still engaged in the Project with HTA and that its services were not truly "terminated," but merely "on-hold."

As a result of the foregoing, a reasonable jury could find that MedMatica's relationship with HTA was not terminated and was ongoing. Thus, MedMatica's motion for summary judgment will be denied on this basis.

**B. The Addendum to the SSAs**

The parties also dispute whether the Addendum to the SSAs contemplated guaranteed payment for Plaintiffs. Plaintiffs argue that the following language in the Addendum did contemplate guaranteed payment: "[P]ayment will be rendered to Consultant . . . each month at 1/2 the Monthly Amount found in Schedule A with receipt of the consultant's invoice." Def.'s Mot. Summ. J. 17, ECF No. 23-3. MedMatica argues that the Addendum did not contemplate guaranteed payment because of the language in paragraph two of the SSAs, which states, "The hours of service on any given day will be those which meet the reasonable needs of MedMatica's Client for the particular task to be performed pursuant to the applicable Addendum." Pls.' Resp. Opp'n Def.'s Mot. Summ. J. Exs. 1-2.

Whether Plaintiffs were entitled to guaranteed payment is a genuine dispute of material fact because the SSA refers to

compensation in different terms. Paragraph two refers to compensation in terms of "hours of service," but the Addendum refers to a "monthly sum" to be paid to Plaintiffs. This conflict leads to conflicting interpretations, i.e., whether the Plaintiffs should be paid a flat monthly rate or whether they should be paid an hourly rate based on their hours of service. A reasonable jury could find that Plaintiffs are entitled to the stipulated monthly amount, or that they are not entitled to the monthly sum but are at least entitled to payment on an hourly basis for any services that were performed.

As a result of the foregoing, a reasonable jury could find that there was a breach of contract in this case. Plaintiffs have demonstrated specific facts showing genuine disputes of material fact as to when MedMatica's relationship with HTA terminated and the amount that Plaintiffs were entitled to receive under the SSAs. Therefore, MedMatica's motion for summary judgment will be denied.

**V. CONCLUSION**

For the foregoing reasons, MedMatica's motion for summary judgment will be denied.